**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| AMAZING SPACES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0629 |
| | § | |
| METRO MINI STORAGE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is a trademark dispute over a logo consisting of a raised, five-pointed star set within a circle. Amazing Spaces, Inc., a self-storage services company based in Houston, Texas, has used this star logo on its self-storage facilities since 1998 and registered it as a trademark in 2004. Metro Mini Storage, another self-storage company located in Houston, Texas, uses a similar five-pointed star set within a circle logo on its buildings. Amazing Spaces sued Metro and its builder, Landmark Interest Corporation ("Landmark"), alleging trademark infringement, trade dress infringement, copyright infringement, unfair competition, and a violation of the Texas Anti-Dilution Statute. (Docket Entry Nos. 1, 24). Metro and Landmark respond that the star mark is not entitled to trademark protection because it is widely used in Texas and does not identify Amazing Spaces. Metro and Landmark also asserted in a counterclaim that Amazing Spaces falsely represented in its trademark application that it was the first company to use the star mark in connection with rental storage spaces and that the trademark registration is invalid and unenforceable as a result. (Docket Entry No. 14).

At the initial conference, this court ordered discovery and motions to occur in stages, with the first stage addressing "issues raised by the 'trademarkability' of the Texas star and similar issues affecting copyright and trade dress." (Docket Entry No. 18). After this discovery, the defendants moved for summary judgment that Amazing Spaces's star mark cannot be trademarked. (Docket Entry No. 42). Amazing Spaces responded, (Docket Entry No. 44), and the defendants replied, (Docket Entry No. 52). Amazing Spaces moved for summary judgment on the fraud counterclaim, (Docket Entry No. 41), to which the defendants responded, asserting that the initial discovery phase did not include the fraud claim and seeking a continuance under Federal Rule of Civil Procedure 56(f). (Docket Entry No. 43). Amazing Spaces replied, arguing that the defendants are not entitled to a continuance because they "aggressively pursued discovery on their fraud claims within the initial discovery phase." (Docket Entry No. 48).

Based on a careful review of the motions, responses, and replies, the evidence in the record, the parties' submissions, and the applicable law, this court grants the defendants' motion for summary judgment. The undisputed facts in the summary judgment record show that, as a matter of law, the star mark is not entitled to trademark protection. Amazing Spaces's motion for summary judgment on the fraud counterclaim is denied as moot.

The reasons for these rulings are explained in detail below.

## I.     Background

Amazing Spaces provides self-storage services at three locations in the Houston area. (Docket Entry No. 44, Declaration Of Kathy Tautenhahn at ¶4). Amazing Spaces was incorporated in 1997 by Scott and Kathy Tautenhahn. The corporate logo is a series of mountain peaks with the star mark on the top of each peak and the words "Amazing Spaces. Self Storage • Boxes • Moving

Supplies" at the base.  Amazing Spaces opened its first storage facility on West Road in Northwest Houston in May 1998.  Landmark constructed the West Road facility.  (Docket Entry No. 44, Declaration of Kathy Tautenhahn, at ¶ 8).  Amazing Spaces had Landmark place a five-pointed raised star within a circle on the outside walls beneath the roof peaks of the West Road buildings. (*Id.*).  In 2001, Amazing Spaces opened a storage facility on Louetta Road in Spring, Texas and in 2006 opened a third facility off Interstate 45 in The Woodlands.  (*Id.*).  Landmark built both these facilities.  Both used the raised star design under the roof peaks.  (Docket Entry No. 42, Ex. 2, Deposition of Kathy Tautenhahn at 50:24–25).

Amazing Spaces asserts that it has used the star mark on the facades of its facilities since 1998.  The trademark application filed with the USPTO stated that Amazing Spaces first used the mark in commerce "as early as April 1998."  An advertisement for the May 1998 grand opening of the West Road facility used the star mark to show where the complex was located.  (Docket Entry No. 42, Ex. 11).  Amazing Spaces used advertisements with the star mark indicating the location of its facilities on maps and as a bullet-point graphic to list storage facility amenities.  (Docket Entry No. 44, Ex. I).  Some of the Amazing Spaces advertisements include pictures of the storage buildings showing the star mark.  (*Id.*).  In her affidavit, corporate representative Kathy Tautenhahn stated that the star mark was omitted from advertisements only when "space concerns or the nature of the advertising media" prevented its use. (Docket Entry No. 44, Declaration of Kathy Tautenhahn at ¶21).  Amazing Spaces used telephone messages that told customers to "look for the star." (*Id.*). Tautenhahn stated that Amazing Spaces has used the star mark on all its buildings since April 1998. (*Id.* at ¶¶5-21).  Amazing Spaces asserts that it chose the star mark to represent its business because the star evokes the "amazing spaces" of the outdoors, not because of its association with the State

of Texas.  (Docket Entry No. 44, Declaration of Kathy Tautenhahn at ¶ 16).  Amazing Spaces asserts

that its star mark is not meant to represent Texas because its goal is to become a national franchise.

(*Id.*, at ¶ 17).  Although Amazing Spaces offers franchise opportunities outside Texas, the record

does not include evidence of any locations outside Texas.

Landmark and Metro assert that the star mark cannot be trademarked because it is

"immediately recognizable as the Texas Star."  (Docket Entry No. 42, at 2).  The defendants assert

that the star mark is widely used by businesses, government entities, and individuals across Texas

"to adorn private and public buildings, roadways, signs, business logos, homes, [and] personal

property."  (*Id.*, at 5).  According to the defendants, a five-pointed star "has been a Texas symbol

since the early days of the Texas Republic" and "Texans everywhere seek to preserve and promote

their Texas heritage by displaying the Texas star."  (*Id.*, at 3–4).  The defendants note that the Texas

flag and the seal of the State of Texas each include a five-pointed star.  (*Id.*).  The defendants

submitted a May 12, 2003 press release by the Texas Secretary of State stating as follows:

> As Texans, we take great pride in the symbols of our great state—the
> Lone Star Flag, the Alamo, the Texas State Seal, and so on.  It is a
> reflection of the esteem in which we hold these symbols that
> thousands of Texas businesses choose to include them in their name
> or use them as part of their logo.

(Docket Entry No. 42, Ex. 4).  The defendants assert that the star mark "is well-recognized in the

Lone Star State and beyond."  (Docket Entry No. 42, at 3).

On August 15, 2003, Amazing Spaces applied to register the star mark with the United States

Patent and Trademark Office for use in "Personal Storage Services" under International Class 39.

Before applying for the trademark registration, Amazing Spaces hired a company to conduct a

database search to determine whether any storage-unit companies had registered a similar star mark

with the USPTO.  The survey found no such registration. (Docket Entry No. 42, Ex. 23).  In the application, the Amazing Spaces corporate representative stated under oath as follows:

> [T]o the best of her knowledge and belief, no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when applied to the goods and services of such other person, to cause confusion, to cause mistake, or to deceive.

(Docket Entry No. 41, Ex. 13).  The application was granted on July 6, 2004 as U.S. Trademark Registration No. 2,859, 845 ("the '845 Registration") under international class 39 for "storage services."  (Docket Entry No. 44, Declaration of Kathy Tautenhahn, at ¶ 15).

On one occasion before the trademark application was granted, Amazing Spaces attempted to enforce its mark within the storage industry.  Amazing Spaces threatened legal action against Community Self Storage in 2003 when it learned that Community was using the star mark on its buildings.  In response, Community Self Storage removed the mark.  (Docket Entry No. 44, Declaration of Kathy Tautenhahn at ¶ 38).

Metro and Landmark argue that Amazing Spaces was not the first company to use the star mark in commerce or even within the self-storage industry.  The defendants submitted many pictures of a five-pointed star or five-pointed star-within-a-circle used by businesses and on buildings in Texas.  The defendants also rely on an October 27, 2000 letter from Tautenhahn to an architect working with Amazing Spaces. (Docket Entry No. 42, Ex. 16, EDGE_00050).  Attached to the letter were photographs of different design elements Tautenhahn thought could be used for the new Amazing Spaces facility.  Tautenhahn referred to a design of stars inside a backlit circle that she had seen in a Chili's restaurant and said: "Love the lighted stars-maybe we could use them on the peaks

outside?" (*Id.*, at EDGE_00487).  The defendants assert that Amazing Spaces got the idea to use the star mark from a national restaurant chain.

Metro and Landmark argue that not only is the star-within-a-circle used on a wide variety of business and government buildings, structures, and products, it is used by a large number of self-storage companies.  Metro and Landmark submitted a list of 28 self-storage businesses that have a star or star-within-a-circle on their buildings.  (Docket Entry No. 42, Ex. 8).  Metro also submitted the affidavit of John Thompson, the previous owner of a Houston-area storage rental facility.  (Docket No. 42, Ex. 14, Affidavit of John Thompson).  Thompson stated that in 1997, he and his wife owned Flagship Storage, which is now part of the "Uncle Bob's" chain of self-storage facilities.  Flagship Storage was also built by Landmark.  (*Id.*, at ¶2-3).  According to the defendants, Flagship's facility incorporated the same raised, five-pointed star-within-a-circle found on the Amazing Spaces buildings.  (*Id.*, Exs. A-B).  Thompson stated that the stars used on the Flagship Storage buildings were bought in December 1997 and in place no later than March 1998.  (*Id.*, at ¶7).  Flagship Storage did not have these stars designed and fabricated but bought them "off the shelf."  Thompson also stated that when he left the storage industry in 2003, he was aware of other storage facilities that used the same star mark on their buildings.  (*Id.*, at ¶8).  Nancy Thompson, John's wife, also submitted an affidavit, corroborating his statements.  (Docket No. 42, Ex. 15, Affidavit of Nancy Thompson).    Amazing Spaces responded that 11 of these 28 storage facilities the defendants identified as using a star-within-a-circle were built by Landmark after it built the Amazing Spaces West Road facility incorporating the star mark in early 1998.  Amazing Spaces notes that one of the 28 businesses was Community Self Storage, which removed its stars in 2003 after Amazing Spaces threatened to sue for infringement.  (Docket Entry No. 44, Declaration

6

of Kathy Tautenhahn  at ¶¶34-35).   Amazing Spaces points to the deposition testimony of Morris David Booth, Landmark's owner, and Carl Ray Drake, a Metro employee, that although other storage companies, including Lakeside Landing, Private Mini Storage, Southwest Storage, and Uncle Bob's Storage, used the star mark before Amazing Spaces did, these storage companies were using the design for merely decorative purposes, not to denote any connection with the self-storage business.   (Docket No. 44, Declaration of Gregory M. Luck, Ex. 1, at 59:6–21; Ex. 2, at 84:12-24; 90:1-25).   According to Amazing Spaces, this means that any prior users were not using the star mark as a trademark – a source identifier for their business – but merely as a decoration.   (Docket No. 44, Declaration of Kathy Tautenhahn, at ¶ 32).   Amazing Spaces asserts that the record evidence shows that it was the first to use the star mark as a source identifier for its business and not merely as a decoration.   Amazing Spaces also points to Tautenhahn's statement that she knows that none of these facilities, except Lakeside Landing, used the star mark until after Amazing Spaces did so when it built its first facility in early 1998.   (*Id.* at ¶33).   Amazing Spaces asserts that it was already using the star mark as a symbol of its business before the October 2000 Tautenhahn letter and that Tautenhahn was commenting on the backlit nature of the star and not the star itself.   (*Id.* at ¶ 41).

The parties' summary judgment evidence and arguments are analyzed against the applicable law.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(c).   "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

III.     **Analysis**

A.     **Is the Star Mark Entitled to Trademark Protection?**

A trademark is "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.  A trademark registration by the Patent and Trademark Office (PTO) is "prima facie evidence of the validity of the registered mark . . . ."  15 U.S.C. § 1115(a); *see also Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 194 (5th Cir. 1998) ("Proof of registration of a service mark or trademark [is] . . . prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration. . . .").  "However, if the mark is found to be either generic or descriptive and lacking secondary meaning, a court may cancel it." *Xtreme Lashes*, *LLC v. Xtended Beauty*, *Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (citing 15 U.S.C. § 1119); *see also Vision Center v. Opticks, Inc.* 596 F.2d 111, 119 (5th Cir. 1979) ("Although a statutory presumption of validity is accorded to the marks registered under the Lanham Act, this presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark.").

A plaintiff seeking to establish that it is entitled to protection from infringement by junior users must demonstrate that its mark is protectable, a threshold requirement that "must be satisfied before infringement can be actionable." *Elvis Presley Enters.*, 141 F.3d at 194.  To prove trademark infringement under 15 U.S.C. § 1125(a), a court must first determine if the mark qualifies for protection. *Sno-Wizard Mfg.*, *Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 425 (5th Cir. 1986).  To make this determination, a court must look at the functionality, distinctiveness, and secondary

meaning of the marks.  A trademark is valid if it is either (1) inherently distinctive or (2) has become distinctive through acquiring a secondary meaning.  *Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 768, 112 S.Ct. 2753, 2757 (1992); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 (1985) (citing 15 U.S.C. §§ 1052(e), (f)).

A mark is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal-Mart Stores*, *Inc. v. Samara Bros.*, *Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).  To determine if a mark is inherently distinctive, courts first determine whether the mark is: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.  *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753; *Pebble Beach* Co. *v. Tour 18 I Ltd.*, 155 F.3d 526, 540 (5th Cir. 1998); *Union Nat. Bank of Texas*, *Laredo*, *Tex. v. Union Nat. Bank of Texas*, *Austin*, 909 F.2d 839, 844 (5th Cir. 1990); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980); *Vision Center v. Opticks, Inc*., 596 F.2d 111, 115 (5th Cir. 1990).

Generic marks are not inherently distinctive and receive no trademark protection." *Xtreme Lashes*, 576 F.3d at 227; *see also Pebble Beach*, 155 F.3d at 540 ("A generic mark . . . is never protectable because it connotes 'a particular genus or class of which an individual [product] or service is but a member . . . , rather than the more individualized characteristics of a particular product.'") (second and third alterations in original).  A term or symbol is considered generic if the public does not identify the mark with a particular source, but instead identifies it with "a particular genus or class of which an individual article or service is but a member."  *Soweco*, 617 F.2d 1178 at 1183 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537, F.2d 4, 9 (2d Cir. 1976); *American Heritage Life Insurance Co.* v. *Heritage Life Insurance Co.*, 494 F.2d 3, 11 (5th Cir. 1974)).  A term may be generic in describing one item but not generic in describing another.  For

10

example, "Ivory" is not generic when describing soap.  *Soweco,* at 1183 (citing *Abercrombie & Fitch,* 537 F.2d 4, at 9 n.6).  "Examples of brand names held to be generic terms are Convenient Store retail stores, Dry Ice solid carbon dioxide, Light Beer ale-type beverages, and, in a case where a once-fanciful mark had, over time, been assimilated into the language, Thermos vacuum-insulated bottles."  *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir.1996).

Descriptive marks are not inherently distinctive, but may become protectable by proof of secondary meaning.  *Zatarains*, *Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 793 (5th Cir. 1983); *see also Two Pesos*, 505 U.S. at 767, 112 S.Ct. 2753 (internal citations omitted) ("[T]rademark law requires a demonstration of secondary meaning only when the claimed trademark is not sufficiently distinctive of itself to identify the producer.").  "A mark . . . is descriptive if it 'identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients.'"  *Pebble Beach*, 155 F.3d at 527 (quoting *Zatarains*, 698 F.2d at 790); *see also Xtreme Lashes*, 576 F.3d at 227.  "[I]n many cases, a descriptive term will be an adjective such as 'speedy,' 'friendly,' 'green,' 'menthol,' or 'reliable.'"  *Union Nat'l Bank*, 909 F.2d at 845. *see also Vision Center*, 596 F.2d at 115 ("Vision" in the name Vision Center is descriptive of type of product sold); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845 (5th Cir. 1970) ("Aloe" is descriptive for products that contain the Aloe Vera plant).  A descriptive mark has become distinctive through secondary meaning when it "has come through use to be uniquely associated with a specific source."  *Two Pesos*, 505 U.S. at 767 n.4, 112 S.Ct. 2753.

"[M]arks that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent) are held to be inherently distinctive,"  *WalMart*, 529 U.S. at 210–11, "because their intrinsic nature services to identify a particular source of a product."  *Pebble Beach,*

11

155 F.3d at 540 (quotation omitted).  "A suggestive term suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good." *Xtreme Lashes*, 576 F.3d at 227.  Examples of suggestive marks are "Coppertone®, Orange Crush®, and Playboy®."  *Sara Lee*, 81 F.3d at 463-64.  Fanciful and arbitrary marks are not suggestive of the products or services with which they are associated but "readily identif[y] the producer." *Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981); *see also Soweco,* 617 F.2d at 1183.  "Fanciful" marks are usually "coined words, such as 'Xerox' or 'Kodak.'"  *Union Nat'l Bank*, 909 F.2d at 845.  "An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers."  *Id.* Arbitrary marks "are entitled to trademark protection because they are inherently distinctive – they serve to identify a particular source of a product."  *Igloo-Products Corp. v. Brantex, Inc.*, 202 F.3d 814, 816 (5th Cir. 2000).

The "word spectrum of marks" — generic, descriptive, suggestive, arbitrary, fanciful — does not always "translate into the world of shapes and images."  *See* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13 (4th ed. 2002).  Courts have used the factors set forth in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977), to determine the inherent distinctiveness of shapes and symbols.  Under this test, a court examines whether: (1) the design or shape is a common, basic shape or design; (2) it was unique or unusual in a particular field; and (3) it was a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods which consumers view as mere ornamentation.  *Id.* "[A]ll three questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that

it will automatically be perceived by customers as an indicator of origin—a trademark." J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13 (4th ed. 2002).

### 1.      The Star Mark is not Inherently Distinctive

The defendants argue that the star mark is not trademarkable because it is a generic, common geometric shape.  The defendants point to numerous uses of the five-point star within a circle as a decoration on businesses, homes, and buildings in the State of Texas.  The defendants argue that the use is so ubiquitous that as a matter of law, the symbol is generic and not entitled to trademark protection.  The defendants contend that the ubiquity of the star mark means that it cannot be a source identifier for the Amazing Spaces facilities or services.  Amazing Spaces responds that its star mark is not simply a star, but a stylized version of a star set within a circle.  Amazing Spaces argues that the evidence submitted by the defendants of widespread use of a similar star is irrelevant because most of the evidence is not about the self-storage industry.  Amazing Spaces also argues that the five-pointed star within a circle is "an inherently distinctive trademark which bears no relationship to the products and services with which it is used, and is thus by definition arbitrary or fanciful."  (Docket Entry No. 44, at 15).

The star mark is not a plain five-pointed star; it is shaded and set within a circle.  The shape and shading are sufficient stylization to make the mark more than a common geometric shape.  The star mark Amazing Spaces registered for use in the self-storage industry is not generic.  A mark is generic when it "refers to a particular genus or class of which an individual article or service is but a member."  *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir. 1980).  A five-pointed star within a circle does not refer to a product or service provided by a self-storage company. There is no evidence in the record that the star mark is generically associated with the self-storage

13

industry.  The evidence of widespread use of a five-point star or a five-point star set within a circle by many diverse businesses and government offices supports the conclusion that the star mark is not related to or a generic symbol for self-storage goods or services.  The record does not disclose a connection or relationship between the star mark and the self-storage industry.

The star mark is not descriptive.  It does not identify a characteristic or quality of self-storage service, such as its function or quality.  Amazing Spaces concedes that the star mark is not suggestive.  (Docket Entry No. 44, at 18).  There is no basis to conclude that a five-pointed star set within a circle suggests an attribute of self-storage services.

Although there is no connection between the star mark and the self-storage industry, the star mark cannot be classified as arbitrary or fanciful unless it is inherently distinctive so as to serve as a source identifier for Amazing Spaces.  The factors set out in *Seabrook* are instructive.  The question is whether the star mark is "so unique, unusual or unexpected" in the self-storage industry that "one can assume without proof that it will automatically be perceived by customers as an indicator of origin."  J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13 (4th ed. 2002).  A common symbol may be a valid trademark if it is uncommon within an industry and can identify the source.  *Compare Star Industries, Inc. v. Bacardi & Co. Ltd.* 412 F.3d 373, 382 (2d Cir. 2005) (ruling that a "minimally" stylized "O" found on "Georgi O" alcoholic beverages was entitled to trademark protection because it was sufficiently stylized "to render it slightly more than a simply linear representation of an ellipse or the letter 'O'"); *Ass'n of Coop. Members, Inc. v. Farmland Indus, Inc.,* 684 F.2d 1134, 1142 (5th Cir. 1982) (ruling that a simple double-circle design was trademarkable); *Artisan Mfg. Corp v. All Granite & Marble Corp.,* 559 F.Supp.2d 442, 449-50 (S.D.N.Y. 2008) (ruling that a stylized version of the *fleur de lis* was

14

distinctive within the sink industry); *with Wiley v. American Greetings Corp.* 762 F.2d 139, 141 (1st Cir. 1985) (holding that a heart on a teddy bear was not inherently distinctive because it was common within the industry). Stylized versions of common shapes are trademarkable "when original within the relevant market." *See Star Industries*, 412 F.3d at 382 (stylized "O" "was a unique design in the alcoholic beverage industry at the time it was introduced").

The parties dispute whether Amazing Spaces was the first company to use the star mark in the self-storage industry. The Thompsons' affidavits state that they bought five-pointed stars set within a circle "off the shelf" in December 1997 and that these stars were placed on the buildings at Flagship Storage no later than March 1998. (Docket No. 42, Exs. 14, 15, Thompson Affidavits). Landmark's president and a Metro employee both testified that four other self-storage companies — Lakeside Landing, Private Mini Storage, Southwest Storage, and Uncle Bob's Storage — used the star mark on their buildings before Amazing Spaces. (Docket No. 44, Declaration of Gregory Luck, Ex. 2 at 90:1-25). Amazing Spaces submitted the affidavit of its owner, Kathy Tautenhahn, stating that Amazing Spaces began using the star mark on its buildings in April 1998. (Docket No. 44, Declaration of Kathy Tautenhahn at ¶33). Tautenhahn also stated that of these self-storage companies, only Lakeside Landing used the star mark before Amazing Spaces built its first facility in early 1998. (*Id.*). This factual dispute as to prior use in the self-storage business in Houston does not preclude summary judgment. Regardless of whether Amazing Spaces was the first self-storage business to use the star mark – at least in the Houston area – the mark is not inherently distinctive and does not act as an indicator of origin for any self-storage business, including Amazing Spaces.

A five-pointed star set within a circle is a common symbol long associated with Texas. A drive on a highway, a walk along a downtown street, or a visit to a shopping center drives home just

how common the five-point star within a circle design is.  Examples abound.  The Texas Rangers

badge is a "star in the wheel" design.  Texas is known as the "Lone Star" state.  The star set within

a circle is used as a decoration or ornamentation on innumerable buildings, signs, roads, and

products.  (Docket Entry No. 42, Exs. 6–8, 12, 16–19, 31–32).  The summary judgment record

includes evidence that a five-pointed star set within a circle is currently used in commerce in at least

63 different industries and businesses on buildings, property, and as part of logos.  (*Id.*, Exs. 6, 7).

The evidence also shows that at least 28 other self-storage locations use a five-pointed star set within

a circle on their buildings.  (*Id.*, Ex. 8).  The ubiquitous nature of the five-pointed star set within a

circle precludes a finding that it is inherently distinctive or that it can serve as an indicator of origin

for a particular business.

Amazing Spaces argues that the prevalence of the star mark in Texas does not affect whether

it is protectable.  Amazing Spaces cites *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159,

162-163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), for the proposition that because color — "the

most ubiquitous" and "widespread "thing[] in nature" — can be protected as a trademark, so too can

its star mark.  In *Qualitex*, a company manufactured and sold green-gold dry-cleaning press pads.

After another company, Jacobson Products, began selling pads of a similar color, Qualitex sued for

trademark infringement based on the color of its pads.  The Supreme Court held that a color could

be protected as a trademark but only on a showing of secondary meaning. The Court reasoned that

a product's color is unlike a "fanciful," "arbitrary," or "suggestive" mark, because it does not

"almost automatically tell a customer that [it] refer[s] to a brand," and does not "immediately . . .

signal a brand or a product 'source.'" *Qualitex*, 514 U.S. at 162–63.  However, because a color, like

a "descriptive" word mark, could eventually "come to indicate a product's origin," the Court

16

concluded that it could be protected if secondary meaning was shown. *Id. Qualitex* does not support Amazing Spaces's argument that the star mark is inherently distinctive. The star mark may be protectable, but only upon proof of secondary meaning.

The facts of this case are also distinguishable from the facts in *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009), which involved a mark used by different kinds of products, but not on the type of product that the plaintiff and defendant were selling. In *Xtreme Lashes*, a manufacturer of eyelash extensions owned two marks: XTREME LASHES, featuring a large "X," half of which was formed by a stylized eyelash; and EXTEND YOUR BEAUTY, which was always used in conjunction with the XTREME LASHES mark. The mark owner sued another eyelash extension kit manufacturer that used the mark XTENDED BEAUTY, which also featured a large "X." The Fifth Circuit concluded that XTREME LASHES "arguably has many of the indicia of a suggestive mark and is therefore entitled to protection." *Id.* "The mark uses a misspelling of the word 'extreme' and a stylized eyelash forms part of the 'X.'" *Id.* The defendant cited evidence that the term "xtreme" appeared on many other cosmetic products, but there was no evidence that other sellers of eyelash products used the term "xtreme." *Id.* at 228. The Fifth Circuit reversed the grant of summary judgment, holding that the widespread use of "xtreme" "should be weighed by a jury." *Id.* The plaintiff, XTREME LASHES, was the only eyelash product company that used the term "xtreme." By contrast, in the present case, the record evidence shows that a stylized five-point star within a circle is used by a variety of different businesses, including a number of self-storage companies in Houston, Texas. And, unlike the mark in *Xtreme Lashes*, the mark at issue in this case is not suggestive. The widespread use and prevalence of the star mark leads to the conclusion that the mark is not inherently distinctive. The star mark does not

automatically communicate to the consumer the Amazing Spaces "brand."  There is no basis to conclude that it is inherently distinctive or that it serves as a source identifier for the Amazing Spaces self-storage business.  Because the star mark is not inherently distinctive, Amazing Spaces must produce evidence of secondary meaning to preclude summary judgment.

## 2. The Summary Judgment Evidence Does Not Establish a Fact Issue as to Secondary Meaning

To show secondary meaning, or acquired distinctiveness, the party claiming infringement must show that the primary significance of the mark is to identify the source of the product rather than the product itself.  *Wal-Mart Stores*, 529 U.S. at 210, 120 S.Ct. 1339.   Determining whether a mark has acquired secondary meaning "is primarily an empirical inquiry," and "survey evidence is the most direct and persuasive evidence of secondary meaning."  *Sunbeam Prods. v. West Bend Co.*, 123 F.3d 246, 253–54 (5th Cir.1997), *abrogated on other grounds by Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002).  In addition to survey evidence, courts may also consider "the length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances of actual confusion."  *Id.* at 254.  The defendant's intent in copying the mark is also relevant.  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices*, *Inc. v. Marketing Displays*, *Inc.*, 532 U.S. 23, 32-33, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

In considering the evidence, a court focuses on how it demonstrates that the meaning of the mark or trade dress has been altered in the consumers' minds.  *See id.*  For example, substantial spending on advertising does not itself cause a mark to acquire secondary meaning, but advertisements may emphasize "the source significance of the designation through prominent use of the [mark]" and are likely to alter the mark's meaning in the minds of consumers.  *See*

18

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 13 cmt. c, at 110 (1995).  Determining secondary

meaning is based on empirical information about consumer association of the product design to its

manufacturing source.  *Sunbeam Products*, 123 F.3d at 254.

The defendants argue that there is no evidence in the summary judgment record of secondary

meaning.  The defendants assert that the only relevant record evidence shows that the star mark has

not acquired secondary meaning that identifies Amazing Spaces.  They point to Landmark's

president's deposition testimony that "I don't know of anybody in the industry that recognizes that

star as being Amazing Spaces."  (Docket Entry No. 42, Ex. 15, at 85:18–20).  Amazing Spaces

responds that the record contains ample evidence of secondary meaning.  Amazing Spaces points

to evidence that it has used the star mark for over ten years, during which it has invested resources

into advertising and promoting this mark.  According to the declaration of Kathy Tautenhahn,

Amazing Spaces has spent $723,138.75 in advertising and promoting the star mark.  (Docket Entry

No. 44, Declaration of Kathy Tautenhahn, at ¶ 22).  Tautenhahn's declaration states that Amazing

Spaces has realized $11,539,638.95 in revenue since it began using the star mark.  (*Id.* at ¶ 19).

Amazing Spaces cites *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1130 (Fed. Cir.

1993), *Harlequin Enters., Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir. 1981), and *Imperial*

*Toy Corp. v. Ja-Ru, Inc.*, 1992 WL 373130, at *4 (C.D. Cal. June 8, 1992), for the proposition that

"evidence of extensive advertising and sales alone are sufficient to establish secondary meaning."

(Docket Entry No. 44, at 19).  Amazing Spaces points to its advertisements, some of which tell

customers to "look for the star."  (Docket Entry No. 44, Tautenhahn Declaration at ¶ 21).  Amazing

Spaces relies on Tautenhahn's declaration that the star mark "identif[ies] its storage services to both

customers and prospective customers."  (*Id.* at ¶ 5).  Amazing Spaces has also submitted the

19

declarations of two customers who assert that they were confused by the star mark on Metro's building and thought that it was an Amazing Spaces facility. (Docket Entry No. 44, Declarations of Glen Gilmore and Shane Flores).

Amazing Spaces's reliance on *L.A. Gear*, *Harlequin Enters.*, and *Imperial Toy* is misplaced. In the Fifth Circuit, all of the relevant factors are considered together and "none of those factors alone will prove secondary meaning." *Zatarains*, 698 F.2d at 795. The court's examination of all the relevant factors in *Zatarains* is instructive. In that case, the plaintiff presented evidence that it had used the term "Fish-Fri" to identify a particular batter mix for frying fish for over 30 years and had spent over $400,000 on advertising between 1976 and 1981. *Id.* The plaintiff also introduced two surveys conducted by its expert witness. One was a telephone survey of 100 women in the New Orleans area who fried fish or other seafood three or more times per month. *Id.* Of the women surveyed, twenty-three percent specified Zatarain's "Fish-Fri" as a product they would buy in the market for coating fish or that is made for frying fish. *Id.* In a survey at a New Orleans area mall, 28 of 100 respondents answered "Zatarain's Fish-Fri" in response to the same questions. *Id.* The district court determined that the survey evidence, in combination with the circumstantial evidence of advertising and usage, weighed in favor of finding secondary meaning. The Fifth Circuit affirmed, holding that this determination was not clearly erroneous. *Id.*

By contrast, the Fifth Circuit found insufficient evidence of secondary meaning in *Sunbeam Products*, 125 F.3d at 254. In that case, the plaintiff did not present any survey evidence to prove that the key design features of its American Classic Mixmaster had acquired secondary meaning. *Id.* The plaintiff instead offered evidence of the product design, consumer testimonials, and its sales and marketing history. *Id.* The Fifth Circuit held that "[e]vidence of long use is insufficient to

20

prove secondary meaning . . . without empirical proof that the design 'has come through use to be uniquely associated with a specific source.'"  *Id.* (citing *Two Pesos*, *Inc. v. Taco Cabana*, *Inc.*, 505 U.S. 763, 776 n. 4, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).  Similarly, in *Natural Polymer Intern. Corp. v. S&M Nutec.*, 2004 WL 912568, at *4–5 (N.D. Tex. Apr. 27, 2004), the defendant did not present survey evidence that consumers associated its dog treats, "GREENIES," with the color green.  The treats purported to freshen dogs' breath.  The plaintiff sued for a declaratory judgment that its treats, "Bone-A-Mints" and "Minties", did not infringe the defendant's mark and sought to cancel the defendant's registered mark, "GREENIES."  The issue was whether the color green had acquired distinctiveness through secondary meaning sufficient to associate it in consumers' minds with the defendant's dog treats.  The defendant offered evidence that it "has used the color green in conjunction with its dog treats for over seven years, that sales of GREENIES exceeded $45 million in 2003, that Defendant has spent over $2 million on advertising, that consumers have had 'outstanding experiences' with GREENIES, that Plaintiff intended to copy the color green used in Defendant's dog treats, and that GREENIES has received public recognition for its dog treats."  *Id.* at *5.  The court held that this evidence was insufficient to establish consumers' association between the green color and the product's source.  The evidence of long-term use was insufficient to prove secondary meaning in the absence of evidence that  consumers associated GREENIES with their green color.  The consumer testimonials did not mention the product's green color.  And the "use of a green, breath-freshening product [was] neither new nor unique."  *Id.*  The court held that the defendant had failed to raise a fact issue as to secondary meaning.

The evidence submitted by Amazing Spaces is more like the evidence in *Sunbeam Products* and *Natural Polymer* than in *Zatarains*.  Amazing Spaces did not present survey evidence, which

the Fifth Circuit has recognized as the "most direct and persuasive way of establishing secondary meaning." *Sno-Wizard Mfg.*, 791 F.2d at 427 (quoting *Zatarains*, 698 F.2d at 795).  The evidence Amazing Spaces did submit does not address the essential issue — whether the consuming public associates the star mark with Amazing Spaces.  The evidence about spending on advertising and sales revenue is not probative of secondary meaning because Amazing Spaces's marketing materials do not prominently display the star mark.  Amazing Spaces's logo, the symbol most used in its advertisements, is a series of mountain peaks with the star mark located on each peak and the words "Amazing Spaces. Self Storage • Boxes • Moving Supplies" at the base of the mountain peaks.  Amazing Spaces uses this logo, which incorporates the mountains, sky, *and* stars, to invoke the "amazing spaces" of nature.  This corporate logo is central to all marketing materials Amazing Spaces produces.  The star mark, by contrast, is used typically as a marker on a map to indicate location or as the "bullet" in a bullet point list in paces marketing materials.  The star mark is not a focus or a feature of the logo or of Amazing Spaces marketing materials.  There is no basis to conclude that the 10-year use or spending on advertising has caused the public to think of Amazing Spaces when they see the star mark.

The evidence as to actual confusion does not raise a fact issue as to secondary meaning.  The two customers who provided declarations, Glen Gilmore and Shane Flores, each stated that the use of the star mark "in conjunction with the similarity in the architectural features and designs" of Metro's building led them to believe that it was operated by Amazing Spaces.  (Docket Entry No. 44, Declaration of Glen Gilmore, Declaration of Shane Flores).  There is no evidence that the star mark itself "denote[s] to the consumer 'a single thing coming from a single source.'" *Zatarains*, 698 F.2d at 795.

22

Weighing the relevant factors, this court concludes that the record does not raise a fact issue material to determining whether the star mark has acquired distinctiveness through a secondary meaning.  The defendants' motion for summary judgment is granted.

**B.     The Defendants' Counterclaim for Fraud in Procurement of the Mark**

Amazing Spaces moved for summary judgment on the defendants' affirmative defense and counterclaim of fraud in the procurement of the federally registered star mark.  (Docket Entry No. 41).  Because this court grants the defendants' motion for summary judgment that the star mark is not entitled to trademark protection, the motion for summary judgment on the affirmative defense and counterclaim is denied as moot.

**IV.     Conclusion**

The defendants' motion for summary judgment that the Amazing Spaces star mark is not entitled to trademark protection is granted.  The motion for summary judgment filed by Amazing Spaces on the fraud affirmative defense and counterclaim is denied as moot.  Final judgment is entered by separate order.

SIGNED on September 28, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge